1

2

3

4

5

6

7

8

9                          IN THE UNITED STATES DISTRICT COURT

10                         FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12    JERRY MEANS,                                    CASE NO. CV F 05-1156 LJO

13                          Plaintiff,               _____

                                                     **DECISION ON SOCIAL SECURITY**
                                                     **COMPLAINT**
14          vs.                                      (Docs. 21, 22.)

15    JO ANNE B. BARNHART,
      Commissioner of Social
16    Security,

17                          Defendant.
                                                    /
18    _____

19                                 **INTRODUCTION**

20          Plaintiff Jerry Means ("plaintiff") seeks this Court's review of an administrative law judge's

21    ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits under

22    Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P.

23    73, the parties agreed to proceed before a United States Magistrate Judge, and by a February 24, 2006

24    order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all

25    proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and

26    defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES

27    plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability insurance benefits

28    or to remand for further proceedings.

                                               1

1

## BACKGROUND

2

### Plaintiff's Personal Background

3      Plaintiff is age 55, has a high school education with one year of college, and has 24 years of past

4   relevant work as a machinist, which required constant standing and walking and lifting 100 pounds

5   occasionally and 25-50 pounds frequently.  (AR 14, 107, 113, 382.)

6

### Administrative Proceedings

7

### *Plaintiff's Original Application For Disability Insurance Benefits*

8      On November 13, 2000, plaintiff filed his original application to disability insurance benefits to

9   claim disability since May 26, 1999 due to shoulder and neck impairments.  (AR 37.)  On January 29,

10  2001, the Social Security Administration ("SSA") initially denied plaintiff's claim. (AR 37.)  On May

11  9, 2001, SSA denied plaintiff's claim on reconsideration.  (AR 37.)  Plaintiff filed a June 26, 2001

12  request for an ALJ hearing.  (AR 37.) After a March 19, 2002 hearing, the ALJ issued his June 19, 2002

13  decision to find that plaintiff is able to perform a wide range of light work[1] which does not require

14  frequent overhead reaching or frequent upward gaze and is thus not entitled to disability insurance

15  benefits.  (AR 40, 41.)  Plaintiff did not seek timely review of the ALJ's decision to render it final and

16  binding as to his November 13, 2000 application.  (AR 14.)

17

### *Plaintiff's Current Application For Disability Insurance Benefits*

18      On March 31, 2003, plaintiff protectively filed his current application for disability insurance

19  benefits to claim disability since May 26, 1999 due to shoulder and neck injury.  (AR 89, 102.)  With

20  its July 28, 2003 Notice of Disapproved Claims, SSA determined that plaintiff's condition is not severe

21  enough to prevent plaintiff to work.  (AR 63.)  On August 12, 2003, counsel was appointed for plaintiff.

22  (AR 33.)[2]  On August 19, 2003, plaintiff filed his Request for Reconsideration to claim that he is unable

23  to work.  (AR 67.)  With its September 17, 2003 Notice of Reconsideration, SSA determined that

24  plaintiff's condition is not severe enough to prevent plaintiff to work.  (AR 69.)

25

26      [1]      Light work involves lifting no more than 20 pounds, frequent lifting/carrying 10 pounds, and a good deal
     of walking and standing or sitting most of the time with some pushing and pulling of arm or leg controls.  If a person is able
27   to perform light work, he/she is able also to perform sedentary work.  20 C.F.R. § 404.1567(b).

28      [2]      Plaintiff appears pro se before this Court.

2

1    On October 7, 2003, plaintiff filed his Request for Hearing by Administrative Law Judge to claim

2    he is unable to work.  (AR 73.)  After a March 3, 2005 hearing, the ALJ issued his April 19, 2005

3    decision to conclude that plaintiff has the residual functional capacity to perform a significant range of

4    light work, is not disabled and thus not entitled to disability insurance benefits.  (AR 19, 20.)[3]  Plaintiff

5    submitted to SSA's Appeals Council his May 2, 2005 Request for Review of Hearing Decision/Order

6    to claim that he is unable to work.  (AR 7.)  On July 13, 2005, the Appeals Council denied plaintiff's

7    request for review to render the ALJ's April 19, 2005 decision subject to this Court's review.  (AR 4.)

8                            **Medical History And Records Review**

9    Plaintiff claimed cumulative injuries from his long-time machinist work and received treatment

10   in connection with workers' compensation claims.  (AR 212.)  Plaintiff injured his right shoulder in

11   1994 when on the job as a machinist to require surgical repair.  (AR 182.)  Plaintiff injured his left

12   shoulder in January 1997 when on the job as a machinist and underwent left shoulder arthroscopy with

13   limited debridement and open Mumford distal clavicle excision but experienced persistent left shoulder

14   pain and difficulty to push, pull, lift and carry heavy objects at or above shoulder level.  (AR 134.)

15   Plaintiff underwent further left shoulder surgical repair in May 1999 after which he did not return to

16   work primarily due to his left shoulder.  (AR 182, 213, 264.)  Plaintiff is left-handed.  (AR 182.)

17                        ***Malcolm Ghazal, M.D., Treating Orthopedic Surgeon***

18   On May 27, 1999, orthopedic surgeon Malcolm Ghazal, M.D. ("Dr. Ghazal"), performed a left

19   shoulder arthroscopy with acromioplasty, subacromial decompression and subacromial bursectomy.

20   (AR 131.)  Plaintiff tolerated the procedure well, and Dr. Ghazal's prognosis was fair to good.  (AR

21   132.)  On July 14, 1999, Dr. Ghazal noted plaintiff's 85-90 percent active and passive range of motion

22   with a 4+/5 motor strength in all degrees of freedom.  (AR 200.)  Dr. Ghazal's impression was ongoing,

23   improving shoulder pain.  (AR 200.)  Dr. Ghazal recommended continued physical therapy.  (AR 200.)

24   On August 16, 1999, Dr. Ghazal noted plaintiff's 90 percent active and passive range of motion with

25   _____

26        [3]        Based on the res judicata effect of the June 19, 2002 ALJ decision of which plaintiff did not seek review,
     the ALJ did not consider a disability onset date before June 19, 2002.  (AR 14.)  The ALJ noted that new or material evidence
27   relevant to the unadjudicated period from June 19, 2002 to present "supports the presumption of continuing non-disability
     as it shows that the claimant's condition has not materially changed."  (AR 14.)  The ALJ further noted the absence of medical
28   evidence "that the claimant has new impairments or that his condition has worsened since the hearing in 2002."  (AR 17.)

a 4++/5 motor strength limited by pain. (AR 199.) Dr. Ghazal diagnosed left-sided cervical neck pain with questionable radiculopathy and ongoing left shoulder pain status post arthroscopy 2½ months ago, not yet permanent and stationary. (AR 199.) Dr. Ghazal continued plaintiff on modified activities and discontinued physical therapy. (AR 199.) On August 30, 1999, Dr. Ghazal assessed foraminal stenosis of the left at C5-6 consistent with plaintiff's left arm symptoms. (AR 195.) On October 20, 1999, Dr. Ghazal noted plaintiff's good range of motion and "fairly good" strength and assessed foraminal stenosis at C5-6 on the left consistent with left arm radiculopathy. (AR 194.) Dr. Ghazal prescribed Vicodin and Celebrex. (AR 194.) On December 6, 1999, Dr. Ghazal noted that plaintiff "continues to be unable to work" secondary to cervical neck and left shoulder pain. (AR 88.) Dr. Ghazal's examination revealed 80 percent active range of motion in forward flexion and otherwise 95-100 percent in all other extremes. (AR 188.) Dr. Ghazal found plaintiff's strength as 4+/5. (AR 188.) Dr. Ghazal diagnosed foraminal stenosis at C5-6 on and left consistent with left arm radicular symptoms. (AR 188.)

Plaintiff did not treat next with Dr. Ghazal until February 28, 2001 after he had underwent a C5-6-7 fusion in June 2000. (AR 187.) Dr. Ghazal assessed that plaintiff's left shoulder has 70 percent of active and 90+ percent passive range of motion with 4+/5 motor strength. (AR 187.) Dr. Ghazal diagnosed chronic left shoulder pain and chronic neck pain and found plaintiff permanent and stationary as to his left shoulder. (AR 187.) Dr. Ghazal recommended a functional capacity evaluation and consideration of vocational rehabilitation. (AR 187.)

### *Timothy C. Watson, M.D., Consultative Orthopaedic Surgeon*

On October 22, 1999, plaintiff consulted with board-certified orthopaedic surgeon Timothy C. Watson, M.D. ("Dr. Watson"). Dr. Watson diagnosed mild posterior bulging C5-6 and C6-7 with mild narrowing. (AR 190.) Dr. Watson noted plaintiff's options of living with the pain, anti-inflammatory medications, exercises, heat or ice, pain management and surgery. (AR 190.)

### *Brian H. Clague, M.D., Treating Neurologist*

In connection with his workers' compensation claim, plaintiff treated with neurologist Brian H. Clague ("Dr. Clague"). Dr. Clague's February 14, 2000 examination revealed neck tenderness, restricted neck range of motion, normal shoulder and scapular movement, normal gait, and absence of back tenderness. (AR 184.) Dr. Clague's motor exam in upper extremities was normal. (AR 184.) Dr.

Clague observed "no hard evidence of a cervical radiculitis or radiculopathy." (AR 185.) Dr. Clague concluded that neck pain and headaches resulted from degenerative cervical disc disease and muscle spasm in upper cervical spine, compressing the greater occipital nerves. (AR 181.) Dr. Clague recommended a soft collar trial. (AR 181.) Dr. Clague's March 14, 2000 examination revealed tenderness over the facets in the lower cervical area at C6-C7. (AR 175.) Dr. Clague concluded that plaintiff's neck pain may result from discs at C5 and C6. (AR 176.) After performing a May 3, 2000 cervical discogram, Dr. Clague diagnosed degenerative disc disease at C5-C6 symptomatic with neck, shoulder and arm pain. (AR 172.) On May 15, 2000, Dr. Clague recommended an anterior cervical discectomy fusion C5-6 and C6-7. (AR 170.) On June 20, 2000, Dr. Clague diagnosed symptomatic cervical degenerative disc disease at C5 and C6. (AR 287.) On June 21, 2000, Dr. Clague performed an anterior discectomy C5-6 and C6-7, and plaintiff tolerated the procedure well. (AR 284, 285.)

On July 11, 2000 and August 8, 2000, Dr. Clague noted that plaintiff "is generally doing well" after his June 21, 2000 anterior discectomy of C5-6 and C6-7. (AR 164, 167.) Plaintiff's left shoulder and arm felt "good" with absence of left arm pain. (AR 164.) On September 5, 2000, Dr. Clague noted that if plaintiff's fusions are complete, plaintiff could start a back and neck exercise program and "hopefully he could return into a work situation within six weeks." (AR 162.) On September 26, 2000, plaintiff complained of neck throbbing and popping sound, and Dr. Clague's motor testing revealed 5/5 in major motor groups in upper extremities bilaterally. (AR 159.) Plaintiff was assessed as doing well, was given cervical spine range of motion and isometric exercises to perform twice daily, and was prescribed physical therapy of gentle massage and heat twice weekly for a month. (AR 159-160.) On October 26, 2000, Dr. Clague stopped physical therapy in that it aggravated plaintiff's pain. (AR 155.) Dr. Clague noted that plaintiff's neck surgery and left shoulder problem likely preclude plaintiff's return to his machinist work. (AR 155.)

On January 23, 2001, Dr. Clague found plaintiff permanent and stationary and noted his cervical osteoarthritis to "preclude him from returning to a machinist job. I think he is a candidate for retraining." (AR 153.)

### Aubrey A. Schwartz, M.D., Consultative Orthopaedic Surgeon

Board-certified orthopaedic surgeon Aubrey A. Schwartz, M.D. ("Dr. Schwartz") conducted an

April 11, 2001 qualified medical evaluation in connection with plaintiff's workers' compensation claim. (AR 263.) As to plaintiff's cervical spine, Dr. Schwartz assessed status post anterior discectomy and fusion at C5-6 and C6-7 with residual cervical spondylosis. (AR 266.) Dr. Schwartz concluded that the status of plaintiff's cervical spine precluded "repetitive motion of his neck which would contemplate at least a 50% loss of pre-injury capacity for flexing, extending, bending, and rotating his neck or back; in addition to a 50% loss of his pre-injury capacity for lifting with a preclusion from heavy lifting." (AR 266.) As to plaintiff's left shoulder, Dr. Schwartz assessed chronic tendinitis with associated bursitis and adhesive capsulitis. (AR 267.) Dr. Schwartz further assessed that as to plaintiff's left shoulder, "he appears to have sustained a 50% loss of his pre-injury capacity for lifting, pushing, pulling, gripping, grasping, pinching, holding, torquing, or other activities of comparable physical effort and would have a preclusion from repetitive or strenuous work or heavy work." (AR 267.) Dr. Schwartz precluded overhead work. (AR 267.) As to plaintiff's right shoulder, Dr. Schwartz assessed chronic tendinitis/bursitis/impingement syndrome. (AR 267.) Dr. Schwartz concluded that plaintiff "appears to have sustained a 50% loss of his pre-injury capacity for lifting, pushing, pulling, gripping, grasping, pinching, holding, torquing, or other activities of comparable physical effort and would have a preclusion from repetitive or strenuous work or heavy work." (AR 268.) Dr. Schwartz further precluded overhead work. (AR 268.) Dr. Schwartz recommended future care to include analgesics, anti-inflammatory agents, muscle relaxants, steroid injections, and occasional physical therapy. (AR 267, 268.)

### Michael P. Azevedo, M.D., Treating Physiatrist

Plaintiff treated with physiatrist Michael P. Azevedo, M.D. ("Dr. Azevedo"), in connection with his workers' compensation claim for pain management. (AR 255.) On November 28, 2001, Dr. Azevedo assessed that plaintiff "appears to be quite limited in his ability to do things, as the maneuvers that he performed in the office today seemed to cause a significant degree of pain." (AR 258.) Dr. Azevedo recommended physical therapy for neck and upper extremity and shoulder girdle stretching and strengthening to progress to a work-hardening program. (AR 258.)

During 2002, Dr. Azevedo treated plaintiff for chronic neck and shoulder pain. (AR 237-254.) On January 4, 2002, plaintiff's neck range of motion was decreased in all ranges but better than on his

prior first appointment with Dr. Azevedo. (AR 253.)  Dr. Azevedo found plaintiff's upper extremity strength to be 5/5.  (AR 253.)  Dr. Azevedo started plaintiff on Vicodin 5*500 mg and instructed plaintiff to use it only when he has pain. (AR 254.)  On January 8, 2002, Dr. Azevedo continued plaintiff on physical therapy three times a week for three or four weeks. (AR 252.)  On February 6, 2002, Dr. Azevedo noted that plaintiff progressed in physical therapy to lift 30 pounds with bilateral upper extremities. (AR 250.) Dr. Azevedo noted plaintiff's full upper extremities range of motion and neck range of motion limited in all ranges toward the end range. (AR 250.) Dr. Azevedo assessed 4+/5 to 5-/5 strength in plaintiff's shoulders and 5/5 throughout the rest of the upper extremities.  (AR 250-251.) Dr. Azevedo started plaintiff on Duragesic patches, 25-mcg. (AR 251.) Dr. Azevedo continued plaintiff on physical therapy three times weekly for four weeks.  (AR 249.)  On March 6, 2002, Dr. Azevedo noted plaintiff's upper extremity range of motion within functional limits and upper extremity strength of 5/5 throughout. (AR 247.) Dr. Azevedo added Celebrex 200 mg for pain management and inflammation and Remeron Soltab for sleep and as an antidepressant.  (AR 247-248.)  Dr. Azevedo continued plaintiff on physical therapy to progress to work hardening. (AR 246.)

On April 4, 2002, Dr. Azevedo found plaintiff's neck range of motion limited in all ranges, his upper range of motion within functional limits and his upper extremity strength 5/5 throughout. (AR 244.) Dr. Azevedo increased plaintiff's Duragesic to 50 mcg for better control to tolerate physical therapy, increase mobility, and decrease pain.  (AR 244.)  On May 3, 2002, Dr. Azevedo found plaintiff's neck range of motion limited in all ranges, his upper range of motion within functional limits and his upper extremity strength 5/5 throughout. (AR 242.) Dr. Azevedo recommended a long-term supervised gym program. (AR 241, 242.) On July 3, 2002, plaintiff's wife noted that plaintiff drank an average of 10 beers daily, and Dr. Azevedo warned plaintiff to stop drinking while on the medications. (AR 239.) Dr. Azevedo emphasized to plaintiff "the importance of getting back to work, no matter what it might be." (AR 239.)  Plaintiff acknowledged that "most of his pain is really controlled, and he only has some mild pain in his left shoulder that is occasionally exacerbated by wearing his seatbelt." (AR 239.) Dr. Azevedo noted plaintiff's neck range of motion limited at end ranges, upper extremity range of motion within functional limits, and 5/5 strength throughout upper extremities. (AR 239.) Dr. Azevedo recommended to wean plaintiff off Duragesic, to start him on Effexor, and to return plaintiff

to a long-term supervised gym program. (AR 240.) On October 16, 2002, Dr. Azevedo noted: "Overall, he is doing fairly well, and he is finishing up with physical therapy." (AR 237.) Dr. Azevedo noted plaintiff's improvements with Effexor and interest in a daily exercise program. (AR 237.) Dr. Azevedo found plaintiff's neck and left shoulder upper extremities ranges of motion slightly decreased but the rest of his range of motion within functional limits and upper extremity strength 5/5 throughout. (AR 237.) Dr. Azevedo continued plaintiff on his current medications and recommended an independent gym program. (AR 237.)

During 2003, Dr. Azevedo continued to assess plaintiff with chronic neck and shoulder pain. (AR 231-235, 354-363.) On January 23, 2003, Dr. Azevedo noted that plaintiff's "pain is controlled with the medications when he is completely sedentary." (AR 235.) Dr. Azevedo found plaintiff's neck and shoulder upper extremity range of motion limited, the remainder of his upper extremity range of motion within functional limits, and his upper extremity strength 5/5 throughout. (AR 235.) Dr. Azevedo started plaintiff on OxyContin 20 mg. (AR 236.) On February 25, 2003, Dr. Azevedo noted plaintiff's "moderate degree of pain," upper extremity range of motion within normal limits, and upper extremity strength 5/5 throughout. (AR 233.) Dr. Azevedo discontinued plaintiff on OxyContin and started plaintiff on Methadone 10 mg and Elavil 25 mg for sleep and pain. (AR 233.) On March 27, 2003, Dr. Azevedo noted that Vicodin controls plaintiff's pain to permit plaintiff to do some yard work. (AR 231.) Dr. Azevedo found plaintiff's neck range of motion limited in all ranges, upper extremity range of motion limited in shoulders at end ranges but otherwise within functional limits, and 5/5 strength throughout upper extremities. (AR 231.) Dr. Azevedo stopped Methadone, added Norco 10.325 mg and continued plaintiff's daily stretching and exercise program. (AR 231.) On May 27, 2003, plaintiff acknowledged that he performed light activities at home. (AR 363.) Dr. Azevedo noted plaintiff's neck and upper extremity ranges of motion limited at end ranges and upper extremity strength 5/5 throughout. (AR 363.) Dr. Azevedo started plaintiff on Flexeril 5 mg and discontinued plaintiff's independent gym program. (AR 364.) On July 2, 2003, Dr. Azevedo noted plaintiff's limited neck range of motion, upper extremities range of motion limited only at the left shoulder, and 5/5 upper extremity strength throughout. (AR 358.) Dr. Azevedo resumed an independent gym program for plaintiff. (AR 359.) On September 3, 2003, plaintiff noted that he tried more activities and believed he

8

could perform a computer operator job with a sit/stand desk.  (AR 356.)  Dr. Azevedo noted plaintiff's neck range of motion limited at end ranges, upper extremity range of motion within functional limits, and upper extremity strength 5/5 throughout.  (AR 356.)  Dr. Azevedo continued plaintiff on his exercise program.  (AR 357.)  On December 18, 2003, Dr. Azevedo noted that plaintiff "tries to be as active as possible" along with plaintiff's neck range of motion limited at end ranges, upper extremity range of motion within functional limits, and 5/5 upper extremity strength throughout.  (AR 354.)  Dr. Azevedo continued plaintiff on a daily exercise and stretching program.  (AR 354.)

During 2004 and early 2005, Dr. Azevedo continued to assess plaintiff with chronic neck, shoulder and upper back pain.  (AR 366-371, 348-352.)  On February 17, 2004, Dr. Azevedo noted that plaintiff "is able to do some work around the house," including dishes and mopping.  (AR 352.)  Dr. Azevedo further noted plaintiff's upper and lower extremities range of motion within functional limits, neck range of motion limited at end ranges, and 5/5 upper extremities strength throughout.  (AR 352.)  Dr. Azevedo encouraged plaintiff to continue his daily exercise and stretching program.  (AR 352.)  On February 16, 2004, Dr. Azevedo noted that plaintiff "is doing more activities" and "has been able to work through the pain."  (AR 350.)  Dr. Azevedo again noted plaintiff's neck range of motion limited at end ranges, upper extremity range of motion within functional limitations and 5/5 upper extremity strength throughout.  (AR 350.)  Dr. Azevedo assessed that medications improved plaintiff's pain and recommended to increase plaintiff's activity level.  (AR 350.)  On June 16, 2004, Dr. Azevedo noted that plaintiff tried to do work around the house and "is able to do more each month."  (AR 348.)  Dr. Azevedo noted plaintiff's neck range of motion limited at end stages and 5/5 upper extremity strength.  (AR 348.)  Dr. Azevedo continued to recommend plaintiff's daily exercise and stretching program.  (AR 348.)  On August 16, 2004, Dr. Azevedo noted plaintiff's limited neck range of motion, upper extremity range of motion within functional limits, and 5/5 upper extremity strength throughout.  (AR 370.)  Dr. Azevedo recommended plaintiff's continued daily exercise and stretching program.  (AR 370.)  On October 15, 2004, Dr. Azevedo noted that plaintiff "tries to do as many activities as possible during the day."  (AR 368.)  Dr. Azevedo noted plaintiff's neck range of motion limited in end ranges, upper extremity range of motion within functional limits, and 5/5 upper extremity strength throughout.  (AR 368.)  Dr. Azevedo recommend that plaintiff to continue his daily exercise and stretching program and

1   to increase his household activities.  (AR 368.)  On January 14, 2005, Dr. Azevedo noted plaintiff's

2   limited neck range of motion, upper extremities range of motion within functional limits, and 5/5 upper

3   extremity strength throughout. (AR 366.) Dr. Azevedo continued to encourage plaintiff's daily exercise

4   and stretching program.  (AR 366.)

5   *William J. Previte, D.O., Consultative Orthopaedic Surgeon*

6       Board-certified orthopaedic surgeon William J. Previte, D.O. ("Dr. Previte"), conducted a

7   February 22, 2002 orthopaedic qualified medical evaluation in connection with plaintiff's workers'

8   compensation claim.  (AR 211.)  Dr. Previte diagnosed: (1) history of right shoulder impingement

9   syndrome, surgically treated; (2) cervical spine strain, superimposed upon cervical degenerative changes,

10  consistent with cumulative trauma; (3) status post anterior cervical discectomy and fusion, without

11  instrumentation, C5-6 and C6-7, with residuals; and (4) left shoulder impingement syndrome, status post

12  surgical treatment, including decompression and distal clavicle resection, with residuals, based on

13  cumulative trauma. (AR 224.) Dr. Previte surmised that plaintiff experiences constant slight neck pain

14  with low level activity and frequently increasing to moderate with heavy lifting and extreme cervical

15  movements.  (AR 226.)  Dr. Previte further surmised that plaintiff's left shoulder pain is frequent/slight

16  to moderate and intermittently moderate with pushing, pulling, lifting, carrying or overhead work.  (AR

17  226.)  As to plaintiff's cervical spine, Dr. Previte restricted plaintiff from heavy work and found that

18  plaintiff lost 50 percent of his pre-injury capacity for lifting, carrying, pushing, pulling or performing

19  activities of comparable physical effort.  (AR 227.)  Dr. Previte further restricted plaintiff from overhead

20  upper left extremity work.  (AR 227.)  As to plaintiff's left shoulder, Dr. Previte restricted plaintiff from

21  forceful left arm use below the waist and such as "lifting, carrying, pushing, pulling to include similar

22  functions at chest level."  (AR 227.)  Dr. Previte further restricted plaintiff from overhead work with the

23  left upper extremity.  (AR 227.)  Dr. Previte found plaintiff "incapable of returning to his usual and

24  customary job duties.  Vocational rehabilitation should be afforded him."  (AR 227.)

25  *Non-Examining Physicians*

26      Internist Peter L. Lee, M.D. ("Dr. Lee"), a California Disability Determination Services ("DDS")

27  physician, completed a June 26, 2003 Physical Residual Functional Capacity Assessment to conclude

28  that plaintiff is able to: (1) occasionally lift/carry 20 pounds and 10 pounds frequently; (2) stand and/or

1   walk about six hours in an eight-hour workday; (3) sit about six hours in an eight-hour workday; and (4)

2   push/pull subject to the lift/carry restrictions.  (AR 293.)  Plaintiff found no postural limitations.  (AR

3   294.)  Dr. Lee concluded that continuing non-disability is indicated.  (AR 302.)

4        DDS physician Alfred Torre, M.D. ("Dr. Torre"), completed a June 10, 2003 Physical Residual

5   Functional Capacity Assessment to conclude that plaintiff is able to: (1) occasionally lift/carry 20 pounds

6   and 10 pounds frequently; (2) stand and/or walk about six hours in an eight-hour workday; (3) sit about

7   six hours in an eight-hour workday; and (4) push/pull in the upper extremities with limitations.  (AR

8   326.)  DDS physician Carmen E. Lopez, M.D. ("Dr. Lopez"), affirmed Dr. Torre's assessment.  (AR

9   331.)

10                                    *Medical Imaging*

11        An August 24, 1999 magnetic resonance imaging ("MRI") revealed degenerative changes at C5-6

12   and C6-7 without frank protrusion or spinal stenosis and mild left neural foraminal narrowing at C5-6.

13   (AR 197-198.)   August 24, 1999 cervical spine x-rays revealed narrowing of the C5-6 and C6-7

14   intervertebral discs.  (AR 196.) A March 7, 2000 bone scan revealed mild increased activity of the lower

15   cervical spine in the region of the disc attributed to degenerative change.  (AR 178.) September 26, 2000

16   cervical x-rays revealed status post interbody fusion procedure at C5-6 and C6-7 and no evidence of

17   subluxation from C1-2 through C6-7.  (AR 277.)  April 17, 2003 x-rays revealed complete interbody

18   fusion at C5-6, mild bilateral neural foraminal narrowing, and widened superior mediastinum.  (AR 272,

19   365.) A July 1, 2003 MRI revealed status post solid fusion at C5-6, associated posterocentral osteophyte

20   formation minimally indenting into the ventral CSP space and minimal broad posterior disc bulge at C3-

21   4 with left paracentral annular fissure.  (AR 362.)

22                                    *Medications*

23        Plaintiff's medications have included Celebrex 200 mg, Effexor 75 mg, Norco 10-325 mg,

24   Vicodin, Provigil 200 mg, Oxycoutin 20 mg, Amitriptyline 25 mg, Methadone 10 mg, and Neurontin

25   600 mg.  (AR 107, 116, 125, 127.)

26                                 *Vocational Rehabilitation*

27        In connection with his workers' compensation claim, plaintiff underwent vocational

28   rehabilitation. As of December 9, 2002, rehabilitation counselor Everett O'Keefe ("Mr. O'Keefe") noted

                                              11

1   infeasibility to proceed with vocational rehabilitation and recommended plaintiff to "continue to pursue

2   Social Security eligibility." (AR 315.)  On January 24, 2003, Mr. O'Keefe noted that plaintiff's

3   "demonstrated tolerance at the work evaluation, when combined with his formal work restrictions and

4   his perceptions of limitations, lead me to believe that the worker [plaintiff] cannot currently benefit from

5   vocational rehabilitation." (AR 209, 314.)  As of June 18, 2003, Mr. O'Keefe noted that plaintiff may

6   have physical capacity for an eight-hour day of home-based training, including learning and using

7   computer skills "for a home-based business or ultimately go to work for an employer on a part-time

8   basis." (AR 313.)

9                              **Plaintiff's Activities And Testimony**

10                              *Reports And Questionnaires*

11          Plaintiff completed a March 31, 2003 Disability Report – Adult to claim inability to work since

12   May 26, 1999 due to shoulder and neck injury to cause inability to lift, carry, push, pull and reach above

13   his shoulder. (AR 102.)  Plaintiff has not improved from shoulder and neck surgeries to prevent him

14   to work and experiences pain 24 hours a day. (AR 103, 108.)  Plaintiff has received no treatment for

15   emotional or mental health problems. (AR 104.)

16          Plaintiff completed a May 4, 2003 Pain Questionnaire to note that his neck, shoulder and upper

17   chest pain started in April 1994 after right shoulder surgery, is "constant and severe" and travels from

18   his neck to his mid back and left arm. (AR 116, 118.)  The pain is caused by activity, including physical

19   therapy, driving, sitting and standing. (AR 116.)  The pain lasts 30 minutes and is relieved with lying

20   down and a TENS device. (AR 116, 118.)  Plaintiff's activities include transporting his son to and from

21   school, attending physical therapy, and lying down "most of the day." (AR 118.)  Plaintiff, without

22   assistance, is able to run errands such as going to the Post Office but his wife grocery shops and "does

23   all the chores." (AR 119.)  Plaintiff is able to walk "just in the yard" and to stand or walk 20 minutes

24   at a time. (AR 119.)

25          Plaintiff completed a March 31, 2003 Reconsideration Disability Report to claim worsened neck

26   pain and inability to sit for prolonged periods and to perform normal daily activities "without extreme

27   pain and immobility the next day." (AR 120.)  Plaintiff noted that he is able to care for his personal

28   needs but that his daily activities are limited due to pain and immobility. (AR 122.)

*Plaintiff's March 3, 2005 ALJ Hearing Testimony*

Plaintiff testified at the March 3, 2005 ALJ hearing that since 1999, he has neither worked nor attempted to look for work.  (AR 382.)  Plaintiff lives with his wife in a house where he cares for their pet rabbit.  (AR 383.)  Plaintiff has a drivers license and drives his Chevy El Camino twice daily.  (AR 384.)  Plaintiff takes care of his personal needs, including teeth brushing, shaving, eating, dressing and bathing.  (AR 384.)  Plaintiff prepares simple meals three times daily.  (AR 384.)   Plaintiff washes dishes once daily.  (AR 385.)  Plaintiff does laundry once or twice monthly.  (AR 385.)  Plaintiff dusts furniture once monthly.  (AR 385.)  Once weekly, plaintiff takes out the trash and shops with his wife.  (AR 386.)  Plaintiff denied performing yard work, sweeping, vacuuming, dusting above his shoulder, mopping, window washing, bed making, participating in clubs or social groups, or going to church, out to eat or to movies or similar entertainment.  (AR 385, 386.)

On an average day, plaintiff watches television for three hours, walks around his backyard "now and then" for 15-20 minutes, and listens to music for two or three hours.  (AR 387.)  Once or twice a week, plaintiff uses the computer for five minutes to check e-mail.  (AR 388, 393.)

Plaintiff's left shoulder condition and neck and upper back pain are the basis of plaintiff's disability claim.  (AR 388.)  Plaintiff originally estimated he able to lift eight pounds using both hands.  (AR 388.)  After admitting that he is able to lift five pounds using each hand separately, plaintiff stated that he is able to lift 10 pounds with both hands.  (AR 388, 389.)  Plaintiff denied that he is able to carry a grocery bag with a gallon of milk and a quart of cooking oil.  (AR 389.)  Plaintiff estimated that he is able to stand for 20 minutes and to sit for 30 minutes.  (AR 389, 390.)

Plaintiff is able to lift his left arm over his shoulder but tries to avoid doing so to avoid pain.  (AR 390.)  Plaintiff also experiences left shoulder pain three times a month for five to 10 minutes when sitting and not lifting.  (AR 391.)  Plaintiff is able to use his left arm at waist level for 30 minutes before he experiences pain and would need to rest his arm for 45-60 minutes before using it again for 30 minutes.  (AR 392.)  On a 1-10 severity scale, plaintiff rates as an eight his pain from lifting his arm above his shoulder.  (AR 395.)  Plaintiff's left arm is about the same as it was prior to his left shoulder surgery.  (AR 392.)  Plaintiff uses both of his hands to drive, to comb his hair, and to attach buttons.  (AR 396.)

13

1    Plaintiff has limitations with his right shoulder similar to those of his left shoulder.  (AR 399.)

2    Plaintiff had right shoulder surgery in September 1994 and returned to work.  (AR 399.)  The right

3    shoulder has remained the same.  (AR 399.)

4    Plaintiff experiences constant aching pain in the back of his neck.  (AR 394.)  Sitting up or in

5    a car aggravates the pain.  (AR 394.)  On a 1-10 severity scale, plaintiff rates his neck pain as an eight,

6    deceasing to a seven with medication.  (AR 394.)  Resumed feeling in plaintiff's left hand was his only

7    improvement from his 2000 neck surgery.  (AR 396.)  Plaintiff experiences pain moving his head.  (AR

8    396.)  Plaintiff is able to turn his head only a quarter of the way toward his shoulders.  (AR 397.)

9    Plaintiff experiences daily drowsiness from medications and pointed out no further side effects.

10   (AR 397.)  The drowsiness lasts three hours.  (AR 398.)  Plaintiff estimated that he is able to maintain

11   focus and concentration on a task for two hours.  (AR 398.)  Plaintiff is able to concentrate on a task for

12   two hours, take a 15-minute break, resume the task for two hours and continue doing so through an

13   eight-hour workday.  (AR 398.)

14   ***Vocational Expert Thomas C. Dachelet's March 3, 2005 ALJ Hearing Testimony***

15   Vocational expert Thomas C. Dachelet ("Mr. Dachelet") testified at the March 3, 2005 ALJ

16   hearing that the Dictionary of Occupational Titles characterizes plaintiff's past work as skilled, medium

17   physical demand.  (AR 400.)  For all of his hypotheticals, the ALJ asked Mr. Dachelet to assume a

18   person who has the same age, education and work experience as plaintiff and is left hand dominant.  (AR

19   401.)  As a first hypothetical, the ALJ asked Mr. Dachelet to assume a person who: (1) should avoid

20   heavy work; (2) has lost 50 percent of pre-injury capacity for lifting, carrying, pushing, pulling and

21   comparable activities; (3) should avoid forceful use of the left upper extremity below waist level and at

22   chest level, such as lifting, carrying, pushing and pulling; and (4) should avoid all overhead work with

23   the left upper extremity.  (AR 402.)  Mr. Dachelet testified that such person would not be able to perform

24   plaintiff's past relevant work but that such person would be able to perform sedentary jobs of drivers

25   (497 jobs in California and 4,970 jobs nationally), auto production worker (148 jobs in California and

26   1, 480 nationally), general office clerks (258 jobs in California and 2,580 nationally), and cashier (2,139

27   jobs in California and 21,390 nationally).  (AR 402-403.)

28   As a second hypothetical, the ALJ asked Mr. Dachelet to assume a person who: (1) should avoid

heavy work; (2) has lost 50 percent of pre-injury capacity for lifting, carrying, pushing, pulling and comparable activities; (3) should avoid cervical spine movement extremes; (4) should avoid forceful use of left upper extremity at chest level and below waist, such as lifting, carrying, pushing, pulling and similar activities; and (5) should avoid left upper extremity overhead work.  (AR 403-404.)  Mr. Dachelet testified that such person would not be able to perform plaintiff's past relevant work but would be able to perform the jobs noted in response to the ALJ's first hypothetical.  (AR 405.)

As a third hypothetical, the ALJ asked Mr. Dachelet to assume a person who is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand and walk about six hours of an eight-hour workday; (3) sit about six hours of an eight-hour workday; and (4) push/pull without limitations.  (AR 405.)  Mr. Dachelet testified that such person would be unable to perform plaintiff's past relevant work but would be able to perform unskilled light and sedentary worlds of work.  (AR 405.)  Mr. Dachelet further testified that such person would be able to perform jobs of machinists (843 jobs in California).  (AR 407.)

As a fourth hypothetical, the ALJ asked Mr. Dachelet to assume a person who: (1) is able to lift/carry 20 pounds occasionally and 10 pounds frequently; (2) is able to stand/walk about six hours of an eight-hour workday; (3) is able to sit about six hours in an eight-hour workday; (4) has unlimited pushing and pulling; (5) has limited reaching with left upper extremity; and (6) is able to perform overhead lifting and reaching occasionally.  (AR 408.)  Mr. Dachelet testified that such person would be unable to perform plaintiff's past relevant work but would be able to perform the same work which he identified in response to the ALJ's third hypothetical.  (AR 409.)

As a fifth hypothetical, the ALJ asked Mr. Dachelet to assume a person who is able to sit 30-45 minutes at a time, walk 30 minutes at a time and drive 60 minutes occasionally.  (AR 409.)  Mr. Dachelet testified that such person would be unable to perform plaintiff's past relevant work but would be able to perform light and sedentary jobs which Mr. Dachelet identified in responses to the first and third hypotheticals and reduced by two-thirds for sit/stand requirements.  (AR 410-411.)

As a sixth hypothetical, the ALJ asked Mr. Dachelet to assume a person who: (1) is able to lift/carry 10 pounds; (2) is able to stand 20 minutes at a time; (3) is able to sit 30 minutes at a time; (4) is able occasionally to use the left upper extremity above shoulder level; (5) is unable to turn his/her head

1    more than quarter of the way to shoulder; (6) is able to write for 30 minutes at a time and rest hand for

2    30 minutes before resuming to write; and (7) is unable to perform, other than writing, manipulative

3    tasks, including grabbing, moving or helping.  (AR 411.)  Mr. Dachelet testified that such person would

4    be unable to perform plaintiff's past relevant work or other work.  (AR 411.)

5                                          **The ALJ's Findings**

6          With his April 19, 2005 decision, the ALJ identified the primary issue as whether plaintiff is

7    under a disability.  (AR 13.)  In concluding that plaintiff is not disabled and not entitled to disability

8    insurance benefits, the ALJ found:

9          1.    Plaintiff's discogenic upper back pain, status post C5-7 discectomy and right iliac crest

10               graft, status post-left shoulder arthroscopy, acromioplasty, subacromial decompression,

11               and subacromial bursectomy are considered severe but neither meet nor medically equal

12               an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix

13               1 ("Listing of Impairments").

14         2.    Plaintiff's allegations regarding his limitations are not totally credible.

15         3.    Plaintiff has the residual functional capacity to lift 20 pounds occasionally, to lift/carry

16               10 pounds frequently, and to stand, walk and sit six hours in an eight-hour workday and

17               occasionally is able to reach over the shoulder with his left upper extremity.

18         4.    Although plaintiff is unable to perform his past relevant work, he has transferable skills

19               from skilled work previously performed.

20         5.    Plaintiff has the residual functional capacity to perform a significant range of light work.

21         6.    Although plaintiff's exertional limitations prevent him to perform the full range of light

22               work and using section 202.15 of the Medical-Vocational Guidelines, 20 C.F.R. Part

23               404, Subpart P, Appendix 2 ("Medical-Vocational Guidelines"), there are a significant

24               number of jobs plaintiff is able to perform in the national economy.  (AR 19.)

25                                          **DISCUSSION**

26                                       **Standard Of Review**

27         Congress has provided limited judicial review of a Commissioner's decision made through an

28    ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if

                                                 16

supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[4]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete and detailed objective medical reports of his condition from licensed medical professionals." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)). "Failure to prove disability justifies a denial of benefits." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th

---

[4]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356 (1996).   Plaintiff must furnish medical and other evidence about plaintiff's medical impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine whether you are disabled or blind.   You are responsible for providing that evidence.")

_____Plaintiff claims disability based on his left shoulder condition and neck and upper back pain. (AR 37, 388.)

With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's March 10, 2005 decision.

**Medical Evidence**

Plaintiff argues that the ALJ improperly evaluated the medical evidence.   More specifically, plaintiff contends that the ALJ's rejection of plaintiff's treating physicians is not supported by the record. The Commissioner responds that the ALJ's residual functional capacity finding is supported by substantial evidence of consultative orthopedists Dr. Schwartz and Dr. Previte and non-examining DDS physicians Dr. Lee and Dr. Torre.   The Commissioner contends that the ALJ's finding that plaintiff is able to perform light work limited by reach over the left shoulder only occasionally is consistent with Dr. Schwartz, Dr. Previte and Dr. Torre's opinions.

Dr. Schwartz concluded that plaintiff had a 50 percent loss of pre-injury capacity for lifting and related activities and is precluded from heavy work.   (AR 266-268.)   Consistent with Dr. Schwartz' evaluation, the ALJ found that plaintiff is able to lift 20 pounds occasionally and lift/carry 10 pounds frequently.   (AR 15, 19.)   Dr. Previte found plaintiff had lost 50 percent of his pre-injury capacity for lifting and restricted plaintiff from heavy work and overhead left upper extremity work.   (AR 227.) Plaintiff testified that he is able to use his left arm at waist level with breaks and uses his left hand to drive, comb his hair and attach buttons.   (AR 392, 396.)   The assessments of Dr. Schwartz and Dr. Previte are substantial evidence upon which the ALJ may rely given that the assessments are based on Dr. Schwartz and Dr. Previte's independent clinical examinations of plaintiff.   *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

18

1    In addition, the DDS physicians' residual functional capacity assessments are substantial

2    evidence to support the ALJ's findings in that DDS physicians' assessments are consistent with Dr.

3    Schwartz and Dr. Previte's assessments.  *See Andrews*, 53 F.3d at 1041 (non-examining physician

4    assessments "may serve as substantial evidence when they are supported by other evidence in the record

5    and are consistent with it.") Dr. Lee and Dr. Torre found plaintiff could perform light work and an

6    absence of postural limitations to further support with substantial evidence the ALJ's residual function

7    capacity findings.  (AR 293, 294, 326, 327.)

8    As noted by the Commissioner, treating physicians Dr. Ghazal, Dr. Clague and Dr. Azevedo

9    assessed no specific functional limitations.   As such, there was no treating medical opinion to reject.

10   Medical opinions include physician statements to reflect judgments as to impairment severity,

11   symptoms, diagnosis, prognosis and ability despite impairments and physical or mental restrictions.  20

12   C.F.R. § 404.1527(a)(2).   The ALJ's residual functional capacity findings are consistent with the

13   examining and non-examining physician assessments to which the ALJ properly credited.

14   Plaintiff appears to assert that the ALJ improperly rejected treating physician opinions that

15   plaintiff is disabled because his condition was "permanent and stationary."[5] Despite a designation given

16   by plaintiff's treating physicians, opinions of disability are reserved for the Commissioner.  *See* 20

17   C.F.R. § 404.1527(e)(1) ("We are responsible for making the determination or decision about whether

18   you meet the statutory definition of disability.") Moreover, the "categories of work under the Social

19   Security disability scheme are measured quite differently" than under the California workers'

20   compensation scheme in that they "are differentiated primarily by step increases in lifting capacities."

21   *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "California

22   Guidelines for Work Capacity are not conclusive in a social security case." *Marci v. Chater*, 93 F.3d

23   540, 544 (9th Cir. 1996). "Workers' compensation disability ratings are not controlling in disability cases

24   decided under the Social Security Act, and the terms of art used in the California workers' compensation

25   guidelines are not equivalent to Social Security disability terminology." *Booth v. Barnhart*, 181

26   _____

27   ⁵    For workers' compensation, a disability is "permanent and stationary" "after the employee has reached

28   maximum medical improvement or his or her condition has been stationary for a reasonable period of time." *Gangwish v. Workers' Comp. Appeals Bd.*, 89 Cal.App.4th 1284, 1289, n. 7, 108 Cal.Rptr.2d 1 (2001).

F.Supp.2d 1099, 1104 (C.D. Cal. 2002).  As such, this Court is not bound to opinions that plaintiff is "permanent and stationary."  Nonetheless, Dr. Ghazal recommended plaintiff for consideration of vocational rehabilitation.  (AR 187.)  Dr. Clague was optimistic that plaintiff "could return into a work situation" and found plaintiff a candidate for retraining."  (AR 153, 162.)  Dr. Previte observed that vocational rehabilitation should be provided to plaintiff.  (AR 227.)  Dr. Azevedo consistently advocated that plaintiff increase physical activity and emphasized "the importance of getting back to work, no matter what it might be."  (AR 237, 239- 242, 246, 249, 252, 348, 352, 354, 357, 359, 366, 368, 370.)  Such assessments support the ALJ's finding that although plaintiff could not perform his past machinist work, he is able to perform other work.  (AR 19,20.)

Plaintiff appears to rely on rehabilitation counselor Mr. O'Keefe's comments to promote his alleged disability.  (AR 208-209.)  Such comments are not an acceptable medical source to establish whether plaintiff has a medically determinable impairment.  *See* 20 C.F.R. § 404.1513(a).  Mr. O'Keefe is unqualified to establish existence of a medically determinable impairment or to provide a medical opinion and is not a treating source.  The ALJ addressed vocational rehabilitation records in proper context and did not ignore them.  (AR 16.)

Plaintiff references Dr. Azevedo's records and appears to assert that Dr. Azevedo's references to chronic pain and increased pain medication reflect disability.  "The mere existence of an impairment is insufficient proof of disability."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  "A claimant bears the burden of proving that an impairment is disabling."  *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985).  Dr. Azevedo's records fail to demonstrate plaintiff's inability to work from disability and plaintiff's functional limitations.  Moreover, the ALJ properly called "into question" plaintiff's credibility to discount severity of plaintiff's alleged pain.  (AR 17, 18, 20.)

In sum, plaintiff fails to demonstrate that the ALJ erred in his evaluation of the medical evidence.

### **Vocational Evidence**

Plaintiff appears to assert that the ALJ improperly evaluated vocational evidence.  In his brief, plaintiff cites to an SSA internal June 10, 2003 Medical/Vocational Decision Guide form completed by a DDS analyst in which boxes are checked next to "Not Able to Perform Past Relevant Work" and "Not Able to Perform Other Work, skills are not transferable."  (AR 303.) As noted by the Commissioner, the

guide form misinterprets plaintiff's functional capacities given the substantial evidence of Dr. Schwartz, Dr. Previte, Dr. Lee and Dr. Torre that plaintiff is able to perform light work. The guide form was submitted prior to Dr. Lee and Dr. Torre's findings and lacked their benefit. The DDS analyst who completed the guide form also completed a July 22, 2003 guide form to note that pursuant to section 202.14 of the Medical-Vocational Guidelines, plaintiff is able to perform other work. (AR 341.) The July 22, 2003 guide form is consistent with Dr. Lee and Dr. Torre's residual functional capacity findings and in turn the ALJ's decision.

The ALJ also benefitted from vocational expert Mr. Dachelet's testimony. (AR 400-416.) Mr. Dachelet characterized plaintiff's past machinist work as medium, skilled. (AR 400.) Mr. Dachelet noted that plaintiff has transferable skills. (AR 401.) In response to the ALJ's hypotheticals, Mr. Dachelet testified that a person of plaintiff's age, education and experience and who is able to lift/carry 20 pounds occasionally and 10 pounds frequently and stand, walk and sit for about six hours in an eight-hour workday but was limited to occasional left arm overhead reaching would be able to perform worlds of light and sedentary work and a light, skilled machinist job, existing in significant numbers in the national economy. (AR 402-409.) The ALJ properly explained that based on Mr. Dachelet's testimony and using section 202.15 of the Medical-Vocational Guidelines as a framework, plaintiff is not disabled in that he could perform work existing in the national economy. (AR 18-19.)

In the final step of the five-step disability evaluation, the Commissioner has the burden to show, in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work that exists in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995). Alternatively, the Commissioner can refer to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162. Moreover, the Commissioner may use a vocational expert to determine whether a claimant's skills are able to be used in other work or for similarly complex issues. 20 C.F.R. § 404.1566(e). Here, the ALJ properly relied on vocational expert Mr. Dachelet's testimony, which constitutes substantial evidence, and in particular, Mr. Dachelet's responses to hypotheticals containing the ALJ's residual functional capacity finding. The ALJ also properly relied on section 202.15 of the Medical-Vocational Guidelines

1  to conclude that plaintiff is able to perform work existing in significant numbers in the national

2  economy.   The appropriate factors matched the section, and the ALJ properly took into account

3  plaintiff's non-exertional overhead reaching limitations.   *See Desrosiers*, 846 F.2d at 576 (mere

4  allegation of a non-exertional limitation does no preclude application of the Medical-Vocational

5  Guidelines).   Plaintiff demonstrates no error in the ALJ's evaluation of the vocational evidence given

6  the ALJ's proper use of Mr. Dachelet's testimony and the Medical-Vocational Guidelines and correct

7  step five determination.

8                                    **CONCLUSION AND ORDER**

9           For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

10 properly concluded that plaintiff is not disabled. This Court further finds that the ALJ's decision is

11 supported by substantial evidence in the record as a whole and based on proper legal standards.

12 Accordingly, this Court DENIES plaintiff's request to reverse the Commissioner's decision to deny

13 plaintiff SSI or to remand for further proceedings. This Court DIRECTS the Court's clerk to enter

14 judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

15 plaintiff Jerry Means and to close this action.

16         IT IS SO ORDERED.

17 **Dated:    November 6, 2006             /s/ Lawrence J. O'Neill**
      66h44d                              UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24

25

26

27

28